(Slip Opinion) OCTOBER TERM, 2004 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KELO ET AL. *v.* CITY OF NEW LONDON ET AL.

CERTIORARI TO THE SUPREME COURT OF CONNECTICUT

No. 04–108.   Argued February 22, 2005—Decided June 23, 2005

After approving an integrated development plan designed to revitalize its ailing economy, respondent city, through its development agent, purchased most of the property earmarked for the project from willing sellers, but initiated condemnation proceedings when petitioners, the owners of the rest of the property, refused to sell.  Petitioners brought this state-court action claiming, *inter alia,* that the taking of their properties would violate the "public use" restriction in the Fifth Amendment's Takings Clause.  The trial court granted a permanent restraining order prohibiting the taking of the some of the properties, but denying relief as to others.  Relying on cases such as *Hawaii Housing Authority* v. *Midkiff*, 467 U. S. 229, and *Berman* v. *Parker*, 348 U. S. 26, the Connecticut Supreme Court affirmed in part and reversed in part, upholding all of the proposed takings.

*Held:* The city's proposed disposition of petitioners' property qualifies as a "public use" within the meaning of the Takings Clause.  Pp. 6–20.

  (a) Though the city could not take petitioners' land simply to confer a private benefit on a particular private party, see, *e.g., Midkiff,* 467 U. S., at 245, the takings at issue here would be executed pursuant to a carefully considered development plan, which was not adopted "to benefit a particular class of identifiable individuals," *ibid.*  Moreover, while the city is not planning to open the condemned land—at least not in its entirety—to use by the general public, this "Court long ago rejected any literal requirement that condemned property be put into use for the . . . public."  *Id.,* at 244.  Rather, it has embraced the broader and more natural interpretation of public use as "public purpose."  See, *e.g., Fallbrook Irrigation Dist.* v. *Bradley*, 164 U. S. 112, 158–164.  Without exception, the Court has defined that concept broadly, reflecting its longstanding policy of deference to legislative judgments as to what public needs justify the use of the takings

Syllabus

power. *Berman*, 348 U. S. 26; *Midkiff*, 467 U. S. 229; *Ruckelshaus* v. *Monsanto Co.,* 467 U. S. 986. Pp. 6–13.

   (b) The city's determination that the area at issue was sufficiently distressed to justify a program of economic rejuvenation is entitled to deference. The city has carefully formulated a development plan that it believes will provide appreciable benefits to the community, including, but not limited to, new jobs and increased tax revenue. As with other exercises in urban planning and development, the city is trying to coordinate a variety of commercial, residential, and recreational land uses, with the hope that they will form a whole greater than the sum of its parts. To effectuate this plan, the city has invoked a state statute that specifically authorizes the use of eminent domain to promote economic development. Given the plan's comprehensive character, the thorough deliberation that preceded its adoption, and the limited scope of this Court's review in such cases, it is appropriate here, as it was in *Berman*, to resolve the challenges of the individual owners, not on a piecemeal basis, but rather in light of the entire plan. Because that plan unquestionably serves a public purpose, the takings challenged here satisfy the Fifth Amendment. P. 13.

   (c) Petitioners' proposal that the Court adopt a new bright-line rule that economic development does not qualify as a public use is supported by neither precedent nor logic. Promoting economic development is a traditional and long accepted governmental function, and there is no principled way of distinguishing it from the other public purposes the Court has recognized. See, *e.g., Berman,* 348 U. S., at 24. Also rejected is petitioners' argument that for takings of this kind the Court should require a "reasonable certainty" that the expected public benefits will actually accrue. Such a rule would represent an even greater departure from the Court's precedent. *E.g., Midkiff*, 467 U. S., at 242. The disadvantages of a heightened form of review are especially pronounced in this type of case, where orderly implementation of a comprehensive plan requires all interested parties' legal rights to be established before new construction can commence. The Court declines to second-guess the wisdom of the means the city has selected to effectuate its plan. *Berman*, 348 U. S., at 26. Pp. 13–20.

 268 Conn. 1, 843 A. 2d 500, affirmed.

   STEVENS, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. KENNEDY, J., filed a concurring opinion. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA and THOMAS, JJ., joined. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 04–108

SUSETTE KELO, ET AL., PETITIONERS *v.* CITY OF NEW LONDON, CONNECTICUT, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF CONNECTICUT

[June 23, 2005]

JUSTICE STEVENS delivered the opinion of the Court.

In 2000, the city of New London approved a development plan that, in the words of the Supreme Court of Connecticut, was "projected to create in excess of 1,000 jobs, to increase tax and other revenues, and to revitalize an economically distressed city, including its downtown and waterfront areas." 268 Conn. 1, 5, 843 A. 2d 500, 507 (2004). In assembling the land needed for this project, the city's development agent has purchased property from willing sellers and proposes to use the power of eminent domain to acquire the remainder of the property from unwilling owners in exchange for just compensation. The question presented is whether the city's proposed disposition of this property qualifies as a "public use" within the meaning of the Takings Clause of the Fifth Amendment to the Constitution.[1]

---

[1] "[N]or shall private property be taken for public use, without just compensation." U. S. Const., Amdt. 5. That Clause is made applicable to the States by the Fourteenth Amendment. See *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226 (1897).

I

The city of New London (hereinafter City) sits at the junction of the Thames River and the Long Island Sound in southeastern Connecticut. Decades of economic decline led a state agency in 1990 to designate the City a "distressed municipality." In 1996, the Federal Government closed the Naval Undersea Warfare Center, which had been located in the Fort Trumbull area of the City and had employed over 1,500 people. In 1998, the City's unemployment rate was nearly double that of the State, and its population of just under 24,000 residents was at its lowest since 1920.

These conditions prompted state and local officials to target New London, and particularly its Fort Trumbull area, for economic revitalization. To this end, respondent New London Development Corporation (NLDC), a private nonprofit entity established some years earlier to assist the City in planning economic development, was reactivated. In January 1998, the State authorized a $5.35 million bond issue to support the NLDC's planning activities and a $10 million bond issue toward the creation of a Fort Trumbull State Park. In February, the pharmaceutical company Pfizer Inc. announced that it would build a $300 million research facility on a site immediately adjacent to Fort Trumbull; local planners hoped that Pfizer would draw new business to the area, thereby serving as a catalyst to the area's rejuvenation. After receiving initial approval from the city council, the NLDC continued its planning activities and held a series of neighborhood meetings to educate the public about the process. In May, the city council authorized the NLDC to formally submit its plans to the relevant state agencies for review.[2] Upon

––––––––––

[2] Various state agencies studied the project's economic, environmental, and social ramifications. As part of this process, a team of consultants evaluated six alternative development proposals for the

obtaining state-level approval, the NLDC finalized an integrated development plan focused on 90 acres of the Fort Trumbull area.

The Fort Trumbull area is situated on a peninsula that juts into the Thames River. The area comprises approximately 115 privately owned properties, as well as the 32 acres of land formerly occupied by the naval facility (Trumbull State Park now occupies 18 of those 32 acres). The development plan encompasses seven parcels. Parcel 1 is designated for a waterfront conference hotel at the center of a "small urban village" that will include restaurants and shopping. This parcel will also have marinas for both recreational and commercial uses. A pedestrian "riverwalk" will originate here and continue down the coast, connecting the waterfront areas of the development. Parcel 2 will be the site of approximately 80 new residences organized into an urban neighborhood and linked by public walkway to the remainder of the development, including the state park. This parcel also includes space reserved for a new U. S. Coast Guard Museum. Parcel 3, which is located immediately north of the Pfizer facility, will contain at least 90,000 square feet of research and development office space. Parcel 4A is a 2.4-acre site that will be used either to support the adjacent state park, by providing parking or retail services for visitors, or to support the nearby marina. Parcel 4B will include a renovated marina, as well as the final stretch of the riverwalk. Parcels 5, 6, and 7 will provide land for office and retail space, parking, and water-dependent commercial uses. 1 App. 109–113.

The NLDC intended the development plan to capitalize

––––––––––

area, which varied in extensiveness and emphasis. The Office of Planning and Management, one of the primary state agencies undertaking the review, made findings that the project was consistent with relevant state and municipal development policies. See 1 App. 89–95.

on the arrival of the Pfizer facility and the new commerce it was expected to attract. In addition to creating jobs, generating tax revenue, and helping to "build momentum for the revitalization of downtown New London," *id.*, at 92, the plan was also designed to make the City more attractive and to create leisure and recreational opportunities on the waterfront and in the park.

The city council approved the plan in January 2000, and designated the NLDC as its development agent in charge of implementation. See Conn. Gen. Stat. §8–188 (2005). The city council also authorized the NLDC to purchase property or to acquire property by exercising eminent domain in the City's name. §8–193. The NLDC successfully negotiated the purchase of most of the real estate in the 90-acre area, but its negotiations with petitioners failed. As a consequence, in November 2000, the NLDC initiated the condemnation proceedings that gave rise to this case.[3]

## II

Petitioner Susette Kelo has lived in the Fort Trumbull area since 1997. She has made extensive improvements to her house, which she prizes for its water view. Petitioner Wilhelmina Dery was born in her Fort Trumbull house in 1918 and has lived there her entire life. Her husband Charles (also a petitioner) has lived in the house since they married some 60 years ago. In all, the nine petitioners own 15 properties in Fort Trumbull—4 in parcel 3 of the development plan and 11 in parcel 4A. Ten of the parcels are occupied by the owner or a family member; the other five are held as investment properties. There is no allegation that any of these properties is blighted or otherwise in poor condition; rather, they were condemned

---

[3] In the remainder of the opinion we will differentiate between the City and the NLDC only where necessary.

only because they happen to be located in the development area.

In December 2000, petitioners brought this action in the New London Superior Court. They claimed, among other things, that the taking of their properties would violate the "public use" restriction in the Fifth Amendment. After a 7-day bench trial, the Superior Court granted a permanent restraining order prohibiting the taking of the properties located in parcel 4A (park or marina support). It, however, denied petitioners relief as to the properties located in parcel 3 (office space). 2 App. to Pet. for Cert. 343–350.[4]

After the Superior Court ruled, both sides took appeals to the Supreme Court of Connecticut. That court held, over a dissent, that all of the City's proposed takings were valid. It began by upholding the lower court's determination that the takings were authorized by chapter 132, the State's municipal development statute. See Conn. Gen. Stat. §8–186 *et seq.* (2005). That statute expresses a legislative determination that the taking of land, even developed land, as part of an economic development project is a "public use" and in the "public interest." 268 Conn., at 18–28, 843 A. 2d, at 515–521. Next, relying on cases such as *Hawaii Housing Authority* v. *Midkiff*, 467 U. S. 229 (1984), and *Berman* v. *Parker*, 348 U. S. 26 (1954), the court held that such economic development qualified as a valid public use under both the Federal and State Constitutions. 268 Conn., at 40, 843 A. 2d, at 527.

―――――――

[4] While this litigation was pending before the Superior Court, the NLDC announced that it would lease some of the parcels to private developers in exchange for their agreement to develop the land according to the terms of the development plan. Specifically, the NLDC was negotiating a 99-year ground lease with Corcoran Jennison, a developer selected from a group of applicants. The negotiations contemplated a nominal rent of $1 per year, but no agreement had yet been signed. See 268 Conn. 1, 9, 61, 843 A. 2d 500, 509–510, 540 (2004).

Finally, adhering to its precedents, the court went on to determine, first, whether the takings of the particular properties at issue were "reasonably necessary" to achieving the City's intended public use, *id.*, at 82, 843 A. 2d, at 552–553, and, second, whether the takings were for "reasonably foreseeable needs," *id.*, at 93, 843 A. 2d, at 558–559. The court upheld the trial court's factual findings as to parcel 3, but reversed the trial court as to parcel 4A, agreeing with the City that the intended use of this land was sufficiently definite and had been given "reasonable attention" during the planning process. *Id.*, at 120–121, 843 A. 2d, at 574.

The three dissenting justices would have imposed a "heightened" standard of judicial review for takings justified by economic development. Although they agreed that the plan was intended to serve a valid public use, they would have found all the takings unconstitutional because the City had failed to adduce "clear and convincing evidence" that the economic benefits of the plan would in fact come to pass. *Id.*, at 144, 146, 843 A. 2d, at 587, 588 (Zarella, J., joined by Sullivan, C. J., and Katz, J., concurring in part and dissenting in part).

We granted certiorari to determine whether a city's decision to take property for the purpose of economic development satisfies the "public use" requirement of the Fifth Amendment. 542 U. S. ___ (2004).

III

Two polar propositions are perfectly clear. On the one hand, it has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation. On the other hand, it is equally clear that a State may transfer property from one private party to another if future "use by the public" is the purpose of the taking; the condemnation of land for a railroad with com-

mon-carrier duties is a familiar example. Neither of these propositions, however, determines the disposition of this case.

As for the first proposition, the City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party. See *Midkiff,* 467 U. S., at 245 ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void"); *Missouri Pacific R. Co.* v. *Nebraska,* 164 U. S. 403 (1896).[5] Nor would the City be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit. The takings before us, however, would be executed pursuant to a "carefully considered" development plan. 268 Conn., at 54, 843 A. 2d, at 536. The trial judge and all the members of the Supreme Court of Connecticut agreed that there was no evidence of an illegitimate purpose in this case.[6] Therefore, as was true of the statute

––––––––––

[5] See also *Calder* v. *Bull*, 3 Dall. 386, 388 (1798) ("An ACT of the Legislature (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority. . . . A few instances will suffice to explain what I mean. . . [A] law that takes property from A. and gives it to B: It is against all reason and justice, for a people to entrust a Legislature with SUCH powers; and, therefore, it cannot be presumed that they have done it. The genius, the nature, and the spirit, of our State Governments, amount to a prohibition of such acts of legislation; and the general principles of law and reason forbid them" (emphasis deleted)).

[6] See 268 Conn., at 159, 843 A. 2d, at 595 (Zarella, J., concurring in part and dissenting in part) ("The record clearly demonstrates that the development plan was not intended to serve the interests of Pfizer, Inc., or any other private entity, but rather, to revitalize the local economy by creating temporary and permanent jobs, generating a significant increase in tax revenue, encouraging spin-off economic activities and maximizing public access to the waterfront"). And while the City intends to transfer certain of the parcels to a private developer in a long-term lease—which developer, in turn, is expected to lease the

challenged in *Midkiff,* 467 U. S., at 245, the City's develop-
ment plan was not adopted "to benefit a particular class of
identifiable individuals."

On the other hand, this is not a case in which the City is
planning to open the condemned land—at least not in its
entirety—to use by the general public. Nor will the pri-
vate lessees of the land in any sense be required to operate
like common carriers, making their services available to
all comers. But although such a projected use would be
sufficient to satisfy the public use requirement, this
"Court long ago rejected any literal requirement that
condemned property be put into use for the general pub-
lic." *Id.,* at 244. Indeed, while many state courts in the
mid-19th century endorsed "use by the public" as the
proper definition of public use, that narrow view steadily
eroded over time. Not only was the "use by the public"
test difficult to administer (*e.g.,* what proportion of the
public need have access to the property? at what price?),[7]
but it proved to be impractical given the diverse and al-
ways evolving needs of society.[8] Accordingly, when this

—————

office space and so forth to other private tenants—the identities of
those private parties were not known when the plan was adopted. It is,
of course, difficult to accuse the government of having taken *A*'s prop-
erty to benefit the private interests of *B* when the identity of *B* was
unknown.

[7] See, *e.g., Dayton Gold & Silver Mining Co.* v. *Seawell*, 11 Nev. 394,
410, 1876 WL 4573, *11 (1876) ("If public occupation and enjoyment of
the object for which land is to be condemned furnishes the only and
true test for the right of eminent domain, then the legislature would
certainly have the constitutional authority to condemn the lands of any
private citizen for the purpose of building hotels and theaters. Why
not? A hotel is used by the public as much as a railroad. The public
have the same right, upon payment of a fixed compensation, to seek
rest and refreshment at a public inn as they have to travel upon a
railroad").

[8] From upholding the Mill Acts (which authorized manufacturers
dependent on power-producing dams to flood upstream lands in ex-
change for just compensation), to approving takings necessary for the

Opinion of the Court

Court began applying the Fifth Amendment to the States at the close of the 19th century, it embraced the broader and more natural interpretation of public use as "public purpose." See, *e.g.*, *Fallbrook Irrigation Dist.* v. *Bradley*, 164 U. S. 112, 158–164 (1896). Thus, in a case upholding a mining company's use of an aerial bucket line to transport ore over property it did not own, Justice Holmes' opinion for the Court stressed "the inadequacy of use by the general public as a universal test." *Strickley* v. *Highland Boy Gold Mining Co.,* 200 U. S. 527, 531 (1906).[9] We have repeatedly and consistently rejected that narrow test ever since.[10]

_____

economic development of the West through mining and irrigation, many state courts either circumvented the "use by the public" test when necessary or abandoned it completely. See Nichols, The Meaning of Public Use in the Law of Eminent Domain, 20 B. U. L. Rev. 615, 619–624 (1940) (tracing this development and collecting cases). For example, in rejecting the "use by the public" test as overly restrictive, the Nevada Supreme Court stressed that "[m]ining is the greatest of the industrial pursuits in this state. All other interests are subservient to it. Our mountains are almost barren of timber, and our valleys could never be made profitable for agricultural purposes except for the fact of a home market having been created by the mining developments in different sections of the state. The mining and milling interests give employment to many men, and the benefits derived from this business are distributed as much, and sometimes more, among the laboring classes than with the owners of the mines and mills. . . . The present prosperity of the state is entirely due to the mining developments already made, and the entire people of the state are directly interested in having the future developments unobstructed by the obstinate action of any individual or individuals." *Dayton Gold & Silver Mining Co.*, 11 Nev., at 409–410, 1876 WL, at *11.

[9] See also *Clark* v. *Nash,* 198 U. S. 361 (1905) (upholding a statute that authorized the owner of arid land to widen a ditch on his neighbor's property so as to permit a nearby stream to irrigate his land).

[10] See, *e.g.*, *Mt. Vernon-Woodberry Cotton Duck Co.* v. *Alabama Interstate Power Co.*, 240 U. S. 30, 32 (1916) ("The inadequacy of use by the general public as a universal test is established"); *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1014–1015 (1984) ("This Court, however, has rejected the notion that a use is a public use only if the property

The disposition of this case therefore turns on the question whether the City's development plan serves a "public purpose." Without exception, our cases have defined that concept broadly, reflecting our longstanding policy of deference to legislative judgments in this field.

In *Berman* v. *Parker,* 348 U. S. 26 (1954), this Court upheld a redevelopment plan targeting a blighted area of Washington, D. C., in which most of the housing for the area's 5,000 inhabitants was beyond repair. Under the plan, the area would be condemned and part of it utilized for the construction of streets, schools, and other public facilities. The remainder of the land would be leased or sold to private parties for the purpose of redevelopment, including the construction of low-cost housing.

The owner of a department store located in the area challenged the condemnation, pointing out that his store was not itself blighted and arguing that the creation of a "better balanced, more attractive community" was not a valid public use. *Id.*, at 31. Writing for a unanimous Court, Justice Douglas refused to evaluate this claim in isolation, deferring instead to the legislative and agency judgment that the area "must be planned as a whole" for the plan to be successful. *Id.*, at 34. The Court explained that "community redevelopment programs need not, by force of the Constitution, be on a piecemeal basis—lot by lot, building by building." *Id.*, at 35. The public use underlying the taking was unequivocally affirmed:

> "We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as

_____

taken is put to use for the general public").

well as clean, well-balanced as well as carefully pa-
trolled. In the present case, the Congress and its au-
thorized agencies have made determinations that take
into account a wide variety of values. It is not for us
to reappraise them. If those who govern the District
of Columbia decide that the Nation's Capital should
be beautiful as well as sanitary, there is nothing in
the Fifth Amendment that stands in the way." *Id.*, at
33.

In *Hawaii Housing Authority* v. *Midkiff*, 467 U. S. 229
(1984), the Court considered a Hawaii statute whereby fee
title was taken from lessors and transferred to lessees (for
just compensation) in order to reduce the concentration of
land ownership. We unanimously upheld the statute and
rejected the Ninth Circuit's view that it was "a naked
attempt on the part of the state of Hawaii to take the
property of A and transfer it to B solely for B's private use
and benefit." *Id.*, at 235 (internal quotation marks omit-
ted). Reaffirming *Berman*'s deferential approach to legis-
lative judgments in this field, we concluded that the
State's purpose of eliminating the "social and economic
evils of a land oligopoly" qualified as a valid public use.
467 U. S., at 241–242. Our opinion also rejected the con-
tention that the mere fact that the State immediately
transferred the properties to private individuals upon
condemnation somehow diminished the public character of
the taking. "[I]t is only the taking's purpose, and not its
mechanics," we explained, that matters in determining
public use. *Id.*, at 244.

In that same Term we decided another public use case
that arose in a purely economic context. In *Ruckelshaus* v.
*Monsanto, Co.,* 467 U. S. 986 (1984), the Court dealt with
provisions of the Federal Insecticide, Fungicide, and Ro-
denticide Act under which the Environmental Protection
Agency could consider the data (including trade secrets)

submitted by a prior pesticide applicant in evaluating a subsequent application, so long as the second applicant paid just compensation for the data. We acknowledged that the "most direct beneficiaries" of these provisions were the subsequent applicants, *id.,* at 1014, but we nevertheless upheld the statute under *Berman* and *Midkiff*. We found sufficient Congress' belief that sparing applicants the cost of time-consuming research eliminated a significant barrier to entry in the pesticide market and thereby enhanced competition. 467 U. S., at 1015.

Viewed as a whole, our jurisprudence has recognized that the needs of society have varied between different parts of the Nation, just as they have evolved over time in response to changed circumstances. Our earliest cases in particular embodied a strong theme of federalism, emphasizing the "great respect" that we owe to state legislatures and state courts in discerning local public needs. See *Hairston* v. *Danville & Western R. Co.*, 208 U. S. 598, 606–607 (1908) (noting that these needs were likely to vary depending on a State's "resources, the capacity of the soil, the relative importance of industries to the general public welfare, and the long-established methods and habits of the people").[11] For more than a century, our public use juris-

_____

[11] See also *Clark*, 198 U. S., at 367–368; *Strickley* v. *Highland Boy Gold Mining Co.,* 200 U. S. 527, 531 (1906) ("In the opinion of the legislature and the Supreme Court of Utah the public welfare of that State demands that aerial lines between the mines upon its mountain sides and railways in the valleys below should not be made impossible by the refusal of a private owner to sell the right to cross his land. The Constitution of the United States does not require us to say that they are wrong"); *O'Neill* v. *Leamer,* 239 U. S. 244, 253 (1915) ("States may take account of their special exigencies, and when the extent of their arid or wet lands is such that a plan for irrigation or reclamation according to districts may fairly be regarded as one which promotes the public interest, there is nothing in the Federal Constitution which denies to them the right to formulate this policy or to exercise the power of eminent domain in carrying it into effect. With the local situation the state court is peculiarly familiar and its

prudence has wisely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power.

## IV

Those who govern the City were not confronted with the need to remove blight in the Fort Trumbull area, but their determination that the area was sufficiently distressed to justify a program of economic rejuvenation is entitled to our deference. The City has carefully formulated an economic development plan that it believes will provide appreciable benefits to the community, including—but by no means limited to—new jobs and increased tax revenue. As with other exercises in urban planning and development,[12] the City is endeavoring to coordinate a variety of commercial, residential, and recreational uses of land, with the hope that they will form a whole greater than the sum of its parts. To effectuate this plan, the City has invoked a state statute that specifically authorizes the use of eminent domain to promote economic development. Given the comprehensive character of the plan, the thorough deliberation that preceded its adoption, and the limited scope of our review, it is appropriate for us, as it was in *Berman*, to resolve the challenges of the individual owners, not on a piecemeal basis, but rather in light of the entire plan. Because that plan unquestionably serves a public purpose, the takings challenged here satisfy the public use requirement of the Fifth Amendment.

To avoid this result, petitioners urge us to adopt a new bright-line rule that economic development does not qualify as a public use. Putting aside the unpersuasive suggestion that the City's plan will provide only purely eco-

———————

judgment is entitled to the highest respect").

[12] Cf. *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926).

nomic benefits, neither precedent nor logic supports peti-
tioners' proposal. Promoting economic development is a
traditional and long accepted function of government.
There is, moreover, no principled way of distinguishing
economic development from the other public purposes that
we have recognized. In our cases upholding takings that
facilitated agriculture and mining, for example, we em-
phasized the importance of those industries to the welfare
of the States in question, see, *e.g., Strickley*, 200 U. S. 527;
in *Berman,* we endorsed the purpose of transforming a
blighted area into a "well-balanced" community through
redevelopment, 348 U. S., at 33;[13] in *Midkiff*, we upheld
the interest in breaking up a land oligopoly that "created
artificial deterrents to the normal functioning of the
State's residential land market," 467 U. S., at 242; and in
*Monsanto*, we accepted Congress' purpose of eliminating a
"significant barrier to entry in the pesticide market," 467
U. S., at 1014–1015. It would be incongruous to hold that
the City's interest in the economic benefits to be derived
from the development of the Fort Trumbull area has less
of a public character than any of those other interests.
Clearly, there is no basis for exempting economic devel-

—————

[13] It is a misreading of *Berman* to suggest that the only public use
upheld in that case was the initial removal of blight. See Reply Brief
for Petitioners 8. The public use described in *Berman* extended beyond
that to encompass the purpose of *developing* that area to create condi-
tions that would prevent a reversion to blight in the future. See 348
U. S., at 34–35 ("It was not enough, [the experts] believed, to remove
existing buildings that were insanitary or unsightly. It was important
to redesign the whole area so as to eliminate the conditions that cause
slums. . . . The entire area needed redesigning so that a balanced,
integrated plan could be developed for the region, including not only
new homes, but also schools, churches, parks, streets, and shopping
centers. In this way it was hoped that the cycle of decay of the area
could be controlled and the birth of future slums prevented"). Had the
public use in *Berman* been defined more narrowly, it would have been
difficult to justify the taking of the plaintiff's nonblighted department
store.

opment from our traditionally broad understanding of public purpose.

Petitioners contend that using eminent domain for economic development impermissibly blurs the boundary between public and private takings. Again, our cases foreclose this objection. Quite simply, the government's pursuit of a public purpose will often benefit individual private parties. For example, in *Midkiff*, the forced transfer of property conferred a direct and significant benefit on those lessees who were previously unable to purchase their homes. In *Monsanto*, we recognized that the "most direct beneficiaries" of the data-sharing provisions were the subsequent pesticide applicants, but benefiting them in this way was necessary to promoting competition in the pesticide market. 467 U. S., at 1014.[14] The owner of the department store in *Berman* objected to "taking from one businessman for the benefit of another businessman," 348 U. S., at 33, referring to the fact that under the redevelopment plan land would be leased or sold to private developers for redevelopment.[15] Our rejection of that contention has particular relevance to the instant case: "The public end may be as well or better served through an agency of private enterprise than through a department of

—————————

[14] Any number of cases illustrate that the achievement of a public good often coincides with the immediate benefiting of private parties. See, *e.g.*, *National Railroad Passenger Corporation* v. *Boston & Maine Corp.,* 503 U. S. 407, 422 (1992) (public purpose of "facilitating Amtrak's rail service" served by taking rail track from one private company and transferring it to another private company); *Brown* v. *Legal Foundation of Wash.*, 538 U. S. 216 (2003) (provision of legal services to the poor is a valid public purpose). It is worth noting that in *Hawaii Housing Authority* v. *Midkiff,* 467 U. S. 229 (1984), *Monsanto*, and *Boston & Maine Corp.*, the property in question retained the same use even after the change of ownership.

[15] Notably, as in the instant case, the private developers in *Berman* were required by contract to use the property to carry out the redevelopment plan. See 348 U. S., at 30.

government—or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects." *Id.*, at 34.[16]

It is further argued that without a bright-line rule nothing would stop a city from transferring citizen *A*'s property to citizen *B* for the sole reason that citizen *B* will put the property to a more productive use and thus pay more taxes. Such a one-to-one transfer of property, executed outside the confines of an integrated development plan, is not presented in this case. While such an unusual exercise of government power would certainly raise a suspicion that a private purpose was afoot,[17] the hypo-

---

[16] Nor do our cases support JUSTICE O'CONNOR's novel theory that the government may only take property and transfer it to private parties when the initial taking eliminates some "harmful property use." *Post*, at 8 (dissenting opinion). There was nothing "harmful" about the nonblighted department store at issue in *Berman*, 348 U. S. 26; see also n. 13, *supra;* nothing "harmful" about the lands at issue in the mining and agriculture cases, see, *e.g.*, *Strickley*, 200 U. S. 527; see also nn. 9, 11, *supra;* and certainly nothing "harmful" about the trade secrets owned by the pesticide manufacturers in *Monsanto*, 467 U. S. 986. In each case, the public purpose we upheld depended on a private party's *future* use of the concededly nonharmful property that was taken. By focusing on a property's future use, as opposed to its past use, our cases are faithful to the text of the Takings Clause. See U. S. Const., Amdt. 5. ("[N]or shall private property be taken for public use, without just compensation"). JUSTICE O'CONNOR's intimation that a "public purpose" may not be achieved by the action of private parties, see *post*, at 8, confuses the *purpose* of a taking with its *mechanics*, a mistake we warned of in *Midkiff*, 467 U. S., at 244. See also *Berman*, 348 U. S., at 33–34 ("The public end may be as well or better served through an agency of private enterprise than through a department of government").

[17] Courts have viewed such aberrations with a skeptical eye. See, *e.g.*, *99 Cents Only Stores* v. *Lancaster Redevelopment Agency*, 237 F. Supp. 2d 1123 (CD Cal. 2001); cf. *Cincinnati* v. *Vester*, 281 U. S. 439, 448 (1930) (taking invalid under state eminent domain statute for lack of a reasoned explanation). These types of takings may also implicate other constitutional guarantees. See *Village of Willowbrook* v. *Olech*, 528

Opinion of the Court

thetical cases posited by petitioners can be confronted if and when they arise.[18]  They do not warrant the crafting of an artificial restriction on the concept of public use.[19]

Alternatively, petitioners maintain that for takings of this kind we should require a "reasonable certainty" that the expected public benefits will actually accrue.  Such a rule, however, would represent an even greater departure from our precedent.  "When the legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings—no less than debates over the wisdom of other kinds of socioeconomic legislation—are not to be carried out in the federal courts."  *Midkiff,* 467 U. S., at 242.[20]

————————

U. S. 562 (2000) *(per curiam).*

  [18] Cf. *Panhandle Oil Co.* v. *Mississippi ex rel. Knox,* 277 U. S. 218, 223 (1928) (Holmes, J., dissenting) ("The power to tax is not the power to destroy while this Court sits").

  [19] A parade of horribles is especially unpersuasive in this context, since the Takings Clause largely "operates as a conditional limitation, permitting the government to do what it wants so long as it pays the charge."  *Eastern Enterprises* v. *Apfel*, 524 U. S. 498, 545 (1998) (KENNEDY, J., concurring in judgment and dissenting in part).  Speaking of the takings power, Justice Iredell observed that "[i]t is not sufficient to urge, that the power may be abused, for, such is the nature of all power—such is the tendency of every human institution: and, it might as fairly be said, that the power of taxation, which is only circumscribed by the discretion of the Body, in which it is vested, ought not to be granted, because the Legislature, disregarding its true objects, might, for visionary and useless projects, impose a tax to the amount of nineteen shillings in the pound.  We must be content to limit power where we can, and where we cannot, consistently with its use, we must be content to repose a salutary confidence."  *Calder*, 3 Dall., at 400 (opinion concurring in result).

  [20] See also *Boston & Maine Corp.,* 503 U. S., at 422–423 ("[W]e need not make a specific factual determination whether the condemnation will accomplish its objectives"); *Monsanto*, 467 U. S., at 1015, n. 18 ("Monsanto argues that EPA and, by implication, Congress, misapprehended the true 'barriers to entry' in the pesticide industry and that the challenged provisions of the law create, rather than reduce, barriers to entry. . . . Such economic arguments are better directed to Congress.

Indeed, earlier this Term we explained why similar practical concerns (among others) undermined the use of the "substantially advances" formula in our regulatory takings doctrine. See *Lingle* v. *Chevron U. S. A. Inc.*, 544 U. S. ___, ___ (2005) (slip op., at 14–15) (noting that this formula "would empower—and might often require—courts to substitute their predictive judgments for those of elected legislatures and expert agencies"). The disadvantages of a heightened form of review are especially pronounced in this type of case. Orderly implementation of a comprehensive redevelopment plan obviously requires that the legal rights of all interested parties be established before new construction can be commenced. A constitutional rule that required postponement of the judicial approval of every condemnation until the likelihood of success of the plan had been assured would unquestionably impose a significant impediment to the successful consummation of many such plans.

Just as we decline to second-guess the City's considered judgments about the efficacy of its development plan, we also decline to second-guess the City's determinations as to what lands it needs to acquire in order to effectuate the project. "It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch." *Berman*, 348 U. S., at 35–36.

In affirming the City's authority to take petitioners' properties, we do not minimize the hardship that condem-

––––––––––

The proper inquiry before this Court is not whether the provisions in fact will accomplish their stated objectives. Our review is limited to determining that the purpose is legitimate and that Congress rationally could have believed that the provisions would promote that objective").

nations may entail, notwithstanding the payment of just compensation.[21] We emphasize that nothing in our opinion precludes any State from placing further restrictions on its exercise of the takings power. Indeed, many States already impose "public use" requirements that are stricter than the federal baseline. Some of these requirements have been established as a matter of state constitutional law,[22] while others are expressed in state eminent domain statutes that carefully limit the grounds upon which takings may be exercised.[23] As the submissions of the parties and their *amici* make clear, the necessity and wisdom of using eminent domain to promote economic development are certainly matters of legitimate public debate.[24] This Court's authority, however, extends only to determining whether the City's proposed condemnations are for a "public use" within the meaning of the Fifth Amendment to the Federal Constitution. Because over a century of our

_____

[21] The *amici* raise questions about the fairness of the measure of just compensation. See, *e.g.*, Brief for American Planning Association et al. as *Amici Curiae* 26–30. While important, these questions are not before us in this litigation.

[22] See, *e.g.*, *County of Wayne v. Hathcock*, 471 Mich. 445, 684 N. W. 2d 765 (2004).

[23] Under California law, for instance, a city may only take land for economic development purposes in blighted areas. Cal. Health & Safety Code Ann. §§33030–33037 (West 1997). See, *e.g.*, *Redevelopment Agency of Chula Vista* v. *Rados Bros.*, 95 Cal. App. 4th 309 (2002).

[24] For example, some argue that the need for eminent domain has been greatly exaggerated because private developers can use numerous techniques, including secret negotiations or precommitment strategies, to overcome holdout problems and assemble lands for genuinely profitable projects. See Brief for Jane Jacobs as *Amicus Curiae* 13–15; see also Brief for John Norquist as *Amicus Curiae*. Others argue to the contrary, urging that the need for eminent domain is especially great with regard to older, small cities like New London, where centuries of development have created an extreme overdivision of land and thus a real market impediment to land assembly. See Brief for Connecticut Conference for Municipalities et al. as *Amici Curiae* 13, 21; see also Brief for National League of Cities et al. as *Amici Curiae*.

case law interpreting that provision dictates an affirmative answer to that question, we may not grant petitioners the relief that they seek.

The judgment of the Supreme Court of Connecticut is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 04–108

SUSETTE KELO, ET AL., PETITIONERS *v.* CITY OF
NEW LONDON, CONNECTICUT, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
CONNECTICUT

[June 23, 2005]

JUSTICE KENNEDY, concurring.

I join the opinion for the Court and add these further observations.

This Court has declared that a taking should be upheld as consistent with the Public Use Clause, U. S. Const., Amdt. 5., as long as it is "rationally related to a conceivable public purpose." *Hawaii Housing Authority* v. *Midkiff,* 467 U. S. 229, 241 (1984); see also *Berman* v. *Parker,* 348 U. S. 26 (1954). This deferential standard of review echoes the rational-basis test used to review economic regulation under the Due Process and Equal Protection Clauses, see, *e.g.*, *FCC* v. *Beach Communications, Inc.,* 508 U. S. 307, 313–314 (1993); *Williamson* v. *Lee Optical of Okla., Inc.,* 348 U. S. 483 (1955). The determination that a rational-basis standard of review is appropriate does not, however, alter the fact that transfers intended to confer benefits on particular, favored private entities, and with only incidental or pretextual public benefits, are forbidden by the Public Use Clause.

A court applying rational-basis review under the Public Use Clause should strike down a taking that, by a clear showing, is intended to favor a particular private party, with only incidental or pretextual public benefits, just as a court applying rational-basis review under the Equal Protection Clause must strike down a government classifi-

cation that is clearly intended to injure a particular class of private parties, with only incidental or pretextual public justifications. See *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 446–447, 450 (1985); *Department of Agriculture* v. *Moreno,* 413 U. S. 528, 533–536 (1973). As the trial court in this case was correct to observe, "Where the purpose [of a taking] is economic development and that development is to be carried out by private parties or private parties will be benefited, the court must decide if the stated public purpose—economic advantage to a city sorely in need of it—is only incidental to the benefits that will be confined on private parties of a development plan." 2 App. to Pet. for Cert. 263. See also *ante*, at 7.

A court confronted with a plausible accusation of impermissible favoritism to private parties should treat the objection as a serious one and review the record to see if it has merit, though with the presumption that the government's actions were reasonable and intended to serve a public purpose. Here, the trial court conducted a careful and extensive inquiry into "whether, in fact, the development plan is of primary benefit to . . . the developer [*i.e.*, Corcoran Jennison], and private businesses which may eventually locate in the plan area [*e.g.*, Pfizer], and in that regard, only of incidental benefit to the city." 2 App. to Pet. for Cert. 261. The trial court considered testimony from government officials and corporate officers; *id.*, at 266–271; documentary evidence of communications between these parties, *ibid.*; respondents' awareness of New London's depressed economic condition and evidence corroborating the validity of this concern, *id.*, at 272–273, 278–279; the substantial commitment of public funds by the State to the development project before most of the private beneficiaries were known, *id.*, at 276; evidence that respondents reviewed a variety of development plans and chose a private developer from a group of applicants rather than picking out a particular transferee before-

hand, *id.*, at 273, 278; and the fact that the other private beneficiaries of the project are still unknown because the office space proposed to be built has not yet been rented, *id.*, at 278.

The trial court concluded, based on these findings, that benefiting Pfizer was not "the primary motivation or effect of this development plan"; instead, "the primary motivation for [respondents] was to take advantage of Pfizer's presence." *Id.*, at 276. Likewise, the trial court concluded that "[t]here is nothing in the record to indicate that . . . [respondents] were motivated by a desire to aid [other] particular private entities." *Id.*, at 278. See also *ante*, at 7–8. Even the dissenting justices on the Connecticut Supreme Court agreed that respondents' development plan was intended to revitalize the local economy, not to serve the interests of Pfizer, Corcoran Jennison, or any other private party. 268 Conn. 1, 159, 843 A. 2d 500, 595 (2004) (Zarella, J., concurring in part and dissenting in part). This case, then, survives the meaningful rational basis review that in my view is required under the Public Use Clause.

Petitioners and their *amici* argue that any taking justified by the promotion of economic development must be treated by the courts as *per se* invalid, or at least presumptively invalid. Petitioners overstate the need for such a rule, however, by making the incorrect assumption that review under *Berman* and *Midkiff* imposes no meaningful judicial limits on the government's power to condemn any property it likes. A broad *per se* rule or a strong presumption of invalidity, furthermore, would prohibit a large number of government takings that have the purpose and expected effect of conferring substantial benefits on the public at large and so do not offend the Public Use Clause.

My agreement with the Court that a presumption of invalidity is not warranted for economic development

takings in general, or for the particular takings at issue in this case, does not foreclose the possibility that a more stringent standard of review than that announced in *Berman* and *Midkiff* might be appropriate for a more narrowly drawn category of takings. There may be private transfers in which the risk of undetected impermissible favoritism of private parties is so acute that a presumption (rebuttable or otherwise) of invalidity is warranted under the Public Use Clause. Cf. *Eastern Enterprises* v. *Apfel,* 524 U. S. 498, 549–550 (1998) (KENNEDY, J., concurring in judgment and dissenting in part) (heightened scrutiny for retroactive legislation under the Due Process Clause). This demanding level of scrutiny, however, is not required simply because the purpose of the taking is economic development.

This is not the occasion for conjecture as to what sort of cases might justify a more demanding standard, but it is appropriate to underscore aspects of the instant case that convince me no departure from *Berman* and *Midkiff* is appropriate here. This taking occurred in the context of a comprehensive development plan meant to address a serious city-wide depression, and the projected economic benefits of the project cannot be characterized as *de minimus*. The identity of most of the private beneficiaries were unknown at the time the city formulated its plans. The city complied with elaborate procedural requirements that facilitate review of the record and inquiry into the city's purposes. In sum, while there may be categories of cases in which the transfers are so suspicious, or the procedures employed so prone to abuse, or the purported benefits are so trivial or implausible, that courts should presume an impermissible private purpose, no such circumstances are present in this case.

\*　　\*　　\*

For the foregoing reasons, I join in the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

No. 04–108

SUSETTE KELO, ET AL., PETITIONERS *v.* CITY OF
NEW LONDON, CONNECTICUT, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
CONNECTICUT

[June 23, 2005]

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE,
JUSTICE SCALIA, and JUSTICE THOMAS join, dissenting.

Over two centuries ago, just after the Bill of Rights was
ratified, Justice Chase wrote:

> "An ACT of the Legislature (for I cannot call it a law)
> contrary to the great first principles of the social com-
> pact, cannot be considered a rightful exercise of legis-
> lative authority . . . . A few instances will suffice to
> explain what I mean. . . . [A] law that takes property
> from A. and gives it to B: It is against all reason and
> justice, for a people to entrust a Legislature with
> SUCH powers; and, therefore, it cannot be presumed
> that they have done it." *Calder* v. *Bull*, 3 Dall. 386,
> 388 (1798) (emphasis deleted).

Today the Court abandons this long-held, basic limitation
on government power. Under the banner of economic
development, all private property is now vulnerable to
being taken and transferred to another private owner, so
long as it might be upgraded—*i.e.*, given to an owner who
will use it in a way that the legislature deems more bene-
ficial to the public—in the process. To reason, as the
Court does, that the incidental public benefits resulting
from the subsequent ordinary use of private property
render economic development takings "for public use" is to

wash out any distinction between private and public use of property—and thereby effectively to delete the words "for public use" from the Takings Clause of the Fifth Amendment. Accordingly I respectfully dissent.

I

Petitioners are nine resident or investment owners of 15 homes in the Fort Trumbull neighborhood of New London, Connecticut. Petitioner Wilhelmina Dery, for example, lives in a house on Walbach Street that has been in her family for over 100 years. She was born in the house in 1918; her husband, petitioner Charles Dery, moved into the house when they married in 1946. Their son lives next door with his family in the house he received as a wedding gift, and joins his parents in this suit. Two petitioners keep rental properties in the neighborhood.

In February 1998, Pfizer Inc., the pharmaceuticals manufacturer, announced that it would build a global research facility near the Fort Trumbull neighborhood. Two months later, New London's city council gave initial approval for the New London Development Corporation (NLDC) to prepare the development plan at issue here. The NLDC is a private, nonprofit corporation whose mission is to assist the city council in economic development planning. It is not elected by popular vote, and its directors and employees are privately appointed. Consistent with its mandate, the NLDC generated an ambitious plan for redeveloping 90 acres of Fort Trumbull in order to "complement the facility that Pfizer was planning to build, create jobs, increase tax and other revenues, encourage public access to and use of the city's waterfront, and eventually 'build momentum' for the revitalization of the rest of the city." App. to Pet. for Cert. 5.

Petitioners own properties in two of the plan's seven parcels—Parcel 3 and Parcel 4A. Under the plan, Parcel 3 is slated for the construction of research and office space

as a market develops for such space. It will also retain the existing Italian Dramatic Club (a private cultural organization) though the homes of three plaintiffs in that parcel are to be demolished. Parcel 4A is slated, mysteriously, for "'park support.'" *Id.,* at 345–346. At oral argument, counsel for respondents conceded the vagueness of this proposed use, and offered that the parcel might eventually be used for parking. Tr. of Oral Arg. 36.

To save their homes, petitioners sued New London and the NLDC, to whom New London has delegated eminent domain power. Petitioners maintain that the Fifth Amendment prohibits the NLDC from condemning their properties for the sake of an economic development plan. Petitioners are not hold-outs; they do not seek increased compensation, and none is opposed to new development in the area. Theirs is an objection in principle: They claim that the NLDC's proposed use for their confiscated property is not a "public" one for purposes of the Fifth Amendment. While the government may take their homes to build a road or a railroad or to eliminate a property use that harms the public, say petitioners, it cannot take their property for the private use of other owners simply because the new owners may make more productive use of the property.

## II

The Fifth Amendment to the Constitution, made applicable to the States by the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." When interpreting the Constitution, we begin with the unremarkable presumption that every word in the document has independent meaning, "that no word was unnecessarily used, or needlessly added." *Wright* v. *United States*, 302 U. S. 583, 588 (1938). In keeping with that presumption, we have read the Fifth Amendment's language to impose two distinct

conditions on the exercise of eminent domain: "the taking must be for a 'public use' and 'just compensation' must be paid to the owner." *Brown* v. *Legal Foundation of Wash.*, 538 U. S. 216, 231–232 (2003).

These two limitations serve to protect "the security of Property," which Alexander Hamilton described to the Philadelphia Convention as one of the "great obj[ects] of Gov[ernment]." 1 Records of the Federal Convention of 1787, p. 302 (M. Farrand ed. 1934). Together they ensure stable property ownership by providing safeguards against excessive, unpredictable, or unfair use of the government's eminent domain power—particularly against those owners who, for whatever reasons, may be unable to protect themselves in the political process against the majority's will.

While the Takings Clause presupposes that government can take private property without the owner's consent, the just compensation requirement spreads the cost of condemnations and thus "prevents the public from loading upon one individual more than his just share of the burdens of government." *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 325 (1893); see also *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960). The public use requirement, in turn, imposes a more basic limitation, circumscribing the very scope of the eminent domain power: Government may compel an individual to forfeit her property for the *public's* use, but not for the benefit of another private person. This requirement promotes fairness as well as security. Cf. *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U. S. 302, 336 (2002) ("The concepts of 'fairness and justice' . . . underlie the Takings Clause").

Where is the line between "public" and "private" property use? We give considerable deference to legislatures' determinations about what governmental activities will advantage the public. But were the political branches the

sole arbiters of the public-private distinction, the Public Use Clause would amount to little more than hortatory fluff. An external, judicial check on how the public use requirement is interpreted, however limited, is necessary if this constraint on government power is to retain any meaning. See *Cincinnati* v. *Vester*, 281 U. S. 439, 446 (1930) ("It is well established that . . . the question [of] what is a public use is a judicial one").

Our cases have generally identified three categories of takings that comply with the public use requirement, though it is in the nature of things that the boundaries between these categories are not always firm. Two are relatively straightforward and uncontroversial. First, the sovereign may transfer private property to public ownership—such as for a road, a hospital, or a military base. See, *e.g.*, *Old Dominion Land Co.* v. *United States*, 269 U. S. 55 (1925); *Rindge Co.* v. *County of Los Angeles*, 262 U. S. 700 (1923). Second, the sovereign may transfer private property to private parties, often common carriers, who make the property available for the public's use— such as with a railroad, a public utility, or a stadium. See, *e.g.*, *National Railroad Passenger Corporation* v. *Boston & Maine Corp.*, 503 U. S. 407 (1992); *Mt. Vernon-Woodberry Cotton Duck Co.* v. *Alabama Interstate Power Co.*, 240 U. S. 30 (1916). But "public ownership" and "use-by-the-public" are sometimes too constricting and impractical ways to define the scope of the Public Use Clause. Thus we have allowed that, in certain circumstances and to meet certain exigencies, takings that serve a public purpose also satisfy the Constitution even if the property is destined for subsequent private use. See, *e.g.*, *Berman* v. *Parker*, 348 U. S. 26 (1954); *Hawaii Housing Authority* v. *Midkiff*, 467 U. S. 229 (1984).

This case returns us for the first time in over 20 years to the hard question of when a purportedly "public purpose" taking meets the public use requirement. It presents an

issue of first impression: Are economic development takings constitutional?  I would hold that they are not.  We are guided by two precedents about the taking of real property by eminent domain.   In *Berman*, we upheld takings within a blighted neighborhood of Washington, D. C.   The neighborhood had so deteriorated that, for example, 64.3% of its dwellings were beyond repair.  348 U. S., at 30.  It had become burdened with "overcrowding of dwellings," "lack of adequate streets and alleys," and "lack of light and air."  *Id.,* at 34.  Congress had determined that the neighborhood had become "injurious to the public health, safety, morals, and welfare" and that it was necessary to "eliminat[e] all such injurious conditions by employing all means necessary and appropriate for the purpose," including eminent domain.  *Id.*, at 28.  Mr. Berman's department store was not itself blighted.  Having approved of Congress' decision to eliminate the harm to the public emanating from the blighted neighborhood, however, we did not second-guess its decision to treat the neighborhood as a whole rather than lot-by-lot.  *Id.*, at 34–35; see also *Midkiff*, 467 U. S., at 244 ("it is only the taking's purpose, and not its mechanics, that must pass scrutiny").

In *Midkiff*, we upheld a land condemnation scheme in Hawaii whereby title in real property was taken from lessors and transferred to lessees.  At that time, the State and Federal Governments owned nearly 49% of the State's land, and another 47% was in the hands of only 72 private landowners.   Concentration of land ownership was so dramatic that on the State's most urbanized island, Oahu, 22 landowners owned 72.5% of the fee simple titles.  *Id.*, at 232.   The Hawaii Legislature had concluded that the oligopoly in land ownership was "skewing the State's residential fee simple market, inflating land prices, and injuring the public tranquility and welfare," and therefore enacted a condemnation scheme for redistributing title.

*Ibid.*

In those decisions, we emphasized the importance of deferring to legislative judgments about public purpose. Because courts are ill-equipped to evaluate the efficacy of proposed legislative initiatives, we rejected as unworkable the idea of courts' "'deciding on what is and is not a governmental function and . . . invalidating legislation on the basis of their view on that question at the moment of decision, a practice which has proved impracticable in other fields.'" *Id.*, at 240–241 (quoting *United States ex rel. TVA* v. *Welch*, 327 U. S. 546, 552 (1946)); see *Berman*, *supra*, at 32 ("[T]he legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation"); see also *Lingle* v. *Chevron U. S. A., Inc.*, 544 U. S. \_\_ (2005). Likewise, we recognized our inability to evaluate whether, in a given case, eminent domain is a necessary means by which to pursue the legislature's ends. *Midkiff*, *supra*, at 242; *Berman*, *supra*, at 103.

Yet for all the emphasis on deference, *Berman* and *Midkiff* hewed to a bedrock principle without which our public use jurisprudence would collapse: "A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void." *Midkiff*, 467 U. S., at 245; *id.*, at 241 ("[T]he Court's cases have repeatedly stated that 'one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid'" (quoting *Thompson* v. *Consolidated Gas Util. Corp.*, 300 U. S. 55, 80 (1937))); see also *Missouri Pacific R. Co.* v. *Nebraska*, 164 U. S. 403, 417 (1896). To protect that principle, those decisions reserved "a role for courts to play in reviewing a legislature's judgment of what constitutes a public use . . . [though] the Court in *Berman* made clear that it is 'an extremely narrow' one." *Midkiff*, *supra*, at 240 (quoting *Berman*, *supra*, at 32).

The Court's holdings in *Berman* and *Midkiff* were true
to the principle underlying the Public Use Clause.  In both
those cases, the extraordinary, precondemnation use of the
targeted property inflicted affirmative harm on society—in
*Berman* through blight resulting from extreme poverty
and in *Midkiff* through oligopoly resulting from extreme
wealth.  And in both cases, the relevant legislative body
had found that eliminating the existing property use was
necessary to remedy the harm.  *Berman*, *supra*, at 28–29;
*Midkiff*, *supra*, at 232.  Thus a public purpose was realized
when the harmful use was eliminated.  Because each
taking *directly* achieved a public benefit, it did not matter
that the property was turned over to private use.  Here, in
contrast, New London does not claim that Susette Kelo's
and Wilhelmina Dery's well-maintained homes are the
source of any social harm.  Indeed, it could not so claim
without adopting the absurd argument that any single-
family home that might be razed to make way for an
apartment building, or any church that might be replaced
with a retail store, or any small business that might be
more lucrative if it were instead part of a national fran-
chise, is inherently harmful to society and thus within the
government's power to condemn.

In moving away from our decisions sanctioning the
condemnation of harmful property use, the Court today
significantly expands the meaning of public use.  It holds
that the sovereign may take private property currently
put to ordinary private use, and give it over for new, ordi-
nary private use, so long as the new use is predicted to
generate some secondary benefit for the public—such as
increased tax revenue, more jobs, maybe even aesthetic
pleasure.  But nearly any lawful use of real private prop-
erty can be said to generate some incidental benefit to the
public.  Thus, if predicted (or even guaranteed) positive
side-effects are enough to render transfer from one private
party to another constitutional, then the words "for public

use" do not realistically exclude *any* takings, and thus do not exert any constraint on the eminent domain power.

There is a sense in which this troubling result follows from errant language in *Berman* and *Midkiff*. In discussing whether takings within a blighted neighborhood were for a public use, *Berman* began by observing: "We deal, in other words, with what traditionally has been known as the police power." 348 U. S., at 32. From there it declared that "[o]nce the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear." *Id.*, at 33. Following up, we said in *Midkiff* that "[t]he 'public use' requirement is coterminous with the scope of a sovereign's police powers." 467 U. S., at 240. This language was unnecessary to the specific holdings of those decisions. *Berman* and *Midkiff* simply did not put such language to the constitutional test, because the takings in those cases were within the police power but also for "public use" for the reasons I have described. The case before us now demonstrates why, when deciding if a taking's purpose is constitutional, the police power and "public use" cannot always be equated.

The Court protests that it does not sanction the bare transfer from A to B for B's benefit. It suggests two limitations on what can be taken after today's decision. First, it maintains a role for courts in ferreting out takings whose sole purpose is to bestow a benefit on the private transferee—without detailing how courts are to conduct that complicated inquiry. *Ante*, at 7. For his part, JUSTICE KENNEDY suggests that courts may divine illicit purpose by a careful review of the record and the process by which a legislature arrived at the decision to take— without specifying what courts should look for in a case with different facts, how they will know if they have found it, and what to do if they do not. *Ante*, at 2–3 (concurring opinion). Whatever the details of JUSTICE KENNEDY's as-yet-undisclosed test, it is difficult to envision anyone but

the "stupid staff[er]" failing it. See *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1025–1026, n. 12 (1992). The trouble with economic development takings is that private benefit and incidental public benefit are, by definition, merged and mutually reinforcing. In this case, for example, any boon for Pfizer or the plan's developer is difficult to disaggregate from the promised public gains in taxes and jobs. See App. to Pet. for Cert. 275–277.

Even if there were a practical way to isolate the motives behind a given taking, the gesture toward a purpose test is theoretically flawed. If it is true that incidental public benefits from new private use are enough to ensure the "public purpose" in a taking, why should it matter, as far as the Fifth Amendment is concerned, what inspired the taking in the first place? How much the government does or does not desire to benefit a favored private party has no bearing on whether an economic development taking will or will not generate secondary benefit for the public. And whatever the reason for a given condemnation, the effect is the same from the constitutional perspective—private property is forcibly relinquished to new private ownership.

A second proposed limitation is implicit in the Court's opinion. The logic of today's decision is that eminent domain may only be used to upgrade—not downgrade—property. At best this makes the Public Use Clause redundant with the Due Process Clause, which already prohibits irrational government action. See *Lingle*, 544 U. S. __. The Court rightfully admits, however, that the judiciary cannot get bogged down in predictive judgments about whether the public will actually be better off after a property transfer. In any event, this constraint has no realistic import. For who among us can say she already makes the most productive or attractive possible use of her property? The specter of condemnation hangs over all property. Nothing is to prevent the State from replacing any Motel 6 with a Ritz-Carlton, any home with a shop-

ping mall, or any farm with a factory.  Cf. *Bugryn* v. *Bristol*, 63 Conn. App. 98, 774 A. 2d 1042 (2001) (taking the homes and farm of four owners in their 70's and 80's and giving it to an "industrial park"); *99 Cents Only Stores* v. *Lancaster Redevelopment Authority*, 237 F. Supp. 2d 1123 (CD Cal. 2001) (attempted taking of 99 Cents store to replace with a Costco); *Poletown Neighborhood Council* v. *Detroit*, 410 Mich. 616, 304 N. W. 2d 455 (1981) (taking a working-class, immigrant community in Detroit and giving it to a General Motors assembly plant), overruled by *County of Wayne* v. *Hathcock*, 471 Mich. 415, 684 N. W. 2d 765 (2004); Brief for the Becket Fund for Religious Liberty as *Amicus Curiae* 4–11 (describing takings of religious institutions' properties); Institute for Justice, D. Berliner, Public Power, Private Gain: A Five-Year, State-by-State Report Examining the Abuse of Eminent Domain (2003) (collecting accounts of economic development takings).

The Court also puts special emphasis on facts peculiar to this case: The NLDC's plan is the product of a relatively careful deliberative process; it proposes to use eminent domain for a multipart, integrated plan rather than for isolated property transfer; it promises an array of incidental benefits (even aesthetic ones), not just increased tax revenue; it comes on the heels of a legislative determination that New London is a depressed municipality.  See, *e.g.*, *ante*, at 16 ("[A] one-to-one transfer of property, executed outside the confines of an integrated development plan, is not presented in this case").  JUSTICE KENNEDY, too, takes great comfort in these facts.  *Ante*, at 4 (concurring opinion).  But none has legal significance to blunt the force of today's holding.  If legislative prognostications about the secondary public benefits of a new use can legitimate a taking, there is nothing in the Court's rule or in JUSTICE KENNEDY's gloss on that rule to prohibit property transfers generated with less care, that are less comprehensive, that happen to result from less elaborate process,

whose only projected advantage is the incidence of higher taxes, or that hope to transform an already prosperous city into an even more prosperous one.

Finally, in a coda, the Court suggests that property owners should turn to the States, who may or may not choose to impose appropriate limits on economic development takings. *Ante*, at 19. This is an abdication of our responsibility. States play many important functions in our system of dual sovereignty, but compensating for our refusal to enforce properly the Federal Constitution (and a provision meant to curtail state action, no less) is not among them.

* * *

It was possible after *Berman* and *Midkiff* to imagine unconstitutional transfers from A to B. Those decisions endorsed government intervention when private property use had veered to such an extreme that the public was suffering as a consequence. Today nearly all real property is susceptible to condemnation on the Court's theory. In the prescient words of a dissenter from the infamous decision in *Poletown*, "[n]ow that we have authorized local legislative bodies to decide that a different commercial or industrial use of property will produce greater public benefits than its present use, no homeowner's, merchant's or manufacturer's property, however productive or valuable to its owner, is immune from condemnation for the benefit of other private interests that will put it to a 'higher' use." 410 Mich., at 644–645, 304 N. W. 2d, at 464 (opinion of Fitzgerald, J.). This is why economic development takings "seriously jeopardiz[e] the security of all private property ownership." *Id.*, at 645, 304 N. W. 2d, at 465 (Ryan, J., dissenting).

Any property may now be taken for the benefit of another private party, but the fallout from this decision will not be random. The beneficiaries are likely to be those

citizens with disproportionate influence and power in the political process, including large corporations and development firms. As for the victims, the government now has license to transfer property from those with fewer resources to those with more. The Founders cannot have intended this perverse result. "[T]hat alone is a *just* government," wrote James Madison, "which *impartially* secures to every man, whatever is his *own*." For the National Gazette, Property, (Mar. 29, 1792), reprinted in 14 Papers of James Madison 266 (R. Rutland et al. eds. 1983).

I would hold that the takings in both Parcel 3 and Parcel 4A are unconstitutional, reverse the judgment of the Supreme Court of Connecticut, and remand for further proceedings.

# SUPREME COURT OF THE UNITED STATES

No. 04–108

SUSETTE KELO, ET AL., PETITIONERS *v.* CITY OF
NEW LONDON, CONNECTICUT, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
CONNECTICUT

[June 23, 2005]

JUSTICE THOMAS, dissenting.

Long ago, William Blackstone wrote that "the law of the land . . . postpone[s] even public necessity to the sacred and inviolable rights of private property." 1 Commentaries on the Laws of England 134–135 (1765) (hereinafter Blackstone). The Framers embodied that principle in the Constitution, allowing the government to take property not for "public necessity," but instead for "public use." Amdt. 5. Defying this understanding, the Court replaces the Public Use Clause with a "'[P]ublic [P]urpose'" Clause, *ante*, at 9–10 (or perhaps the "Diverse and Always Evolving Needs of Society" Clause, *ante*, at 8 (capitalization added)), a restriction that is satisfied, the Court instructs, so long as the purpose is "legitimate" and the means "not irrational," *ante*, at 17 (internal quotation marks omitted). This deferential shift in phraseology enables the Court to hold, against all common sense, that a costly urban-renewal project whose stated purpose is a vague promise of new jobs and increased tax revenue, but which is also suspiciously agreeable to the Pfizer Corporation, is for a "public use."

I cannot agree. If such "economic development" takings are for a "public use," any taking is, and the Court has erased the Public Use Clause from our Constitution, as JUSTICE O'CONNOR powerfully argues in dissent. *Ante*, at

1–2, 8–13.  I do not believe that this Court can eliminate
liberties expressly enumerated in the Constitution and
therefore join her dissenting opinion.  Regrettably, how-
ever, the Court's error runs deeper than this.  Today's
decision is simply the latest in a string of our cases con-
struing the Public Use Clause to be a virtual nullity,
without the slightest nod to its original meaning.  In my
view, the Public Use Clause, originally understood, is a
meaningful limit on the government's eminent domain
power.  Our cases have strayed from the Clause's original
meaning, and I would reconsider them.

## I

The Fifth Amendment provides:

> "No person shall be held to answer for a capital, or
> otherwise infamous crime, unless on a presentment or
> indictment of a Grand Jury, except in cases arising in
> the land or naval forces, or in the Militia, when in ac-
> tual service in time of War or public danger; nor shall
> any person be subject for the same offence to be twice
> put in jeopardy of life or limb, nor shall be compelled
> in any criminal case to be a witness against himself,
> nor be deprived of life, liberty, or property, without
> due process, of law; *nor shall private property be taken
> for public use, without just compensation.*"  (Emphasis
> added.)

It is the last of these liberties, the Takings Clause, that is
at issue in this case.  In my view, it is "imperative that the
Court maintain absolute fidelity to" the Clause's express
limit on the power of the government over the individual,
no less than with every other liberty expressly enumer-
ated in the Fifth Amendment or the Bill of Rights more
generally.  *Shepard* v. *United States,* 544 U. S. ___, ___
(2005) (slip op., at 2) (THOMAS, J., concurring in part and
concurring in judgment) (internal quotation marks omitted).

　　Though one component of the protection provided by the Takings Clause is that the government can take private property only if it provides "just compensation" for the taking, the Takings Clause also prohibits the government from taking property except "for public use."　Were it otherwise, the Takings Clause would either be meaningless or empty.　If the Public Use Clause served no function other than to state that the government may take property through its eminent domain power—for public or private uses—then it would be surplusage.　See *ante*, at 3–4 (O'CONNOR, J., dissenting); see also *Marbury* v. *Madison,* 1 Cranch 137, 174 (1803) ("It cannot be presumed that any clause in the constitution is intended to be without effect"); *Myers* v. *United States,* 272 U. S. 52, 151 (1926).　Alternatively, the Clause could distinguish those takings that require compensation from those that do not. That interpretation, however, "would permit private property to be taken or appropriated for private use without any compensation whatever." *Cole* v. *La Grange,* 113 U. S. 1, 8 (1885) (interpreting same language in the Missouri Public Use Clause).　In other words, the Clause would require the government to compensate for takings done "for public use," leaving it free to take property for purely private uses without the payment of compensation.　This would contradict a bedrock principle well established by the time of the founding: that all takings required the payment of compensation.　1 Blackstone 135; 2 J. Kent, Commentaries on American Law 275 (1827) (hereinafter Kent); J. Madison, for the National Property Gazette, (Mar. 27, 1792), in 14 Papers of James Madison 266, 267 (R. Rutland et al. eds. 1983) (arguing that no property "shall be taken *directly* even for public use without indemnification to the owner").[1]　The Public Use Clause, like the

_____

[1] Some state constitutions at the time of the founding lacked just compensation clauses and took property even without providing com-

Just Compensation Clause, is therefore an express limit on the government's power of eminent domain.

The most natural reading of the Clause is that it allows the government to take property only if the government owns, or the public has a legal right to use, the property, as opposed to taking it for any public purpose or necessity whatsoever. At the time of the founding, dictionaries primarily defined the noun "use" as "[t]he act of employing any thing to any purpose." 2 S. Johnson, A Dictionary of the English Language 2194 (4th ed. 1773) (hereinafter Johnson). The term "use," moreover, "is from the Latin *utor*, which means 'to use, make use of, avail one's self of, employ, apply, enjoy, etc." J. Lewis, Law of Eminent Domain §165, p. 224, n. 4 (1888) (hereinafter Lewis). When the government takes property and gives it to a private individual, and the public has no right to use the property, it strains language to say that the public is "employing" the property, regardless of the incidental benefits that might accrue to the public from the private use. The term "public use," then, means that either the government or its citizens as a whole must actually "employ" the taken property. See *id.*, at 223 (reviewing founding-era dictionaries).

Granted, another sense of the word "use" was broader in meaning, extending to "[c]onvenience" or "help," or "[q]ualities that make a thing proper for any purpose." 2 Johnson 2194. Nevertheless, read in context, the term "public use" possesses the narrower meaning. Elsewhere, the Constitution twice employs the word "use," both times in its narrower sense. Claeys, Public-Use Limitations and Natural Property Rights, 2004 Mich. St. L. Rev. 877, 897

--------

pensation. See *Lucas* v. *South Carolina Coastal Council,* 505 U. S. 1003, 1056–1057 (1992) (Blackmun, J., dissenting). The Framers of the Fifth Amendment apparently disagreed, for they expressly prohibited uncompensated takings, and the Fifth Amendment was not incorporated against the States until much later. See *id.*, at 1028, n. 15.

(hereinafter Public Use Limitations). Article 1, §10 provides that "the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States," meaning the Treasury itself will control the taxes, not use it to any beneficial end. And Article I, §8 grants Congress power "[t]o raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years." Here again, "use" means "employed to raise and support Armies," not anything directed to achieving any military end. The same word in the Public Use Clause should be interpreted to have the same meaning.

Tellingly, the phrase "public use" contrasts with the very different phrase "general Welfare" used elsewhere in the Constitution. See *ibid.* ("Congress shall have Power To . . . provide for the common Defence and general Welfare of the United States"); preamble (Constitution established "to promote the general Welfare"). The Framers would have used some such broader term if they had meant the Public Use Clause to have a similarly sweeping scope. Other founding-era documents made the contrast between these two usages still more explicit. See Sales, Classical Republicanism and the Fifth Amendment's "Public Use" Requirement, 49 Duke L. J. 339, 368 (2000) (hereinafter Sales) (noting contrast between, on the one hand, the term "public use" used by 6 of the first 13 States and, on the other, the terms "public exigencies" employed in the Massachusetts Bill of Rights and the Northwest Ordinance, and the term "public necessity" used in the Vermont Constitution of 1786). The Constitution's text, in short, suggests that the Takings Clause authorizes the taking of property only if the public has a right to employ it, not if the public realizes any conceivable benefit from the taking.

The Constitution's common-law background reinforces this understanding. The common law provided an express

method of eliminating uses of land that adversely impacted the public welfare: nuisance law. Blackstone and Kent, for instance, both carefully distinguished the law of nuisance from the power of eminent domain. Compare 1 Blackstone 135 (noting government's power to take private property with compensation), with 3 *id.*, at 216 (noting action to remedy "*public* . . .nuisances, which affect the public and are an annoyance to *all* the king's subjects"); see also 2 Kent 274–276 (distinguishing the two). Blackstone rejected the idea that private property could be taken solely for purposes of any public benefit. "So great . . . is the regard of the law for private property," he explained, "that it will not authorize the least violation of it; no, not even for the general good of the whole community." 1 Blackstone 135. He continued: "If a new road . . . were to be made through the grounds of a private person, it might perhaps be extensively beneficial to the public; but the law permits no man, or set of men, to do this without the consent of the owner of the land." *Ibid.* Only "by giving [the landowner] full indemnification" could the government take property, and even then "[t]he public [was] now considered as an individual, treating with an individual for an exchange." *Ibid.* When the public took property, in other words, it took it as an individual buying property from another typically would: for one's own use. The Public Use Clause, in short, embodied the Framers' understanding that property is a natural, fundamental right, prohibiting the government from "tak[ing] *property* from A. and giv[ing] it to B." *Calder* v. *Bull,* 3 Dall. 386, 388 (1798); see also *Wilkinson* v. *Leland,* 2 Pet. 627, 658 (1829); *Vanhorne's Lessee* v. *Dorrance,* 2 Dall. 304, 311 (CC Pa. 1795).

The public purpose interpretation of the Public Use Clause also unnecessarily duplicates a similar inquiry required by the Necessary and Proper Clause. The Takings Clause is a prohibition, not a grant of power: The

Constitution does not expressly grant the Federal Government the power to take property for any public purpose whatsoever. Instead, the Government may take property only when necessary and proper to the exercise of an expressly enumerated power. See *Kohl* v. *United States,* 91 U. S. 367, 371–372 (1876) (noting Federal Government's power under the Necessary and Proper Clause to take property "needed for forts, armories, and arsenals, for navy-yards and light-houses, for custom-houses, post-offices, and court-houses, and for other public uses"). For a law to be within the Necessary and Proper Clause, as I have elsewhere explained, it must bear an "obvious, simple, and direct relation" to an exercise of Congress' enumerated powers, *Sabri* v. *United States,* 541 U. S. 600, 613 (2004) (THOMAS, J., concurring in judgment), and it must not "subvert basic principles of" constitutional design, *Gonzales* v. *Raich, ante,* at \_\_ (THOMAS, J., dissenting). In other words, a taking is permissible under the Necessary and Proper Clause only if it serves a valid public purpose. Interpreting the Public Use Clause likewise to limit the government to take property only for sufficiently public purposes replicates this inquiry. If this is all the Clause means, it is, once again, surplusage. See *supra*, at 3. The Clause is thus most naturally read to concern whether the property is used by the public or the government, not whether the purpose of the taking is legitimately public.

## II

Early American eminent domain practice largely bears out this understanding of the Public Use Clause. This practice concerns state limits on eminent domain power, not the Fifth Amendment, since it was not until the late 19th century that the Federal Government began to use the power of eminent domain, and since the Takings Clause did not even arguably limit state power until after the passage of the Fourteenth Amendment. See Note, The

Public Use Limitation on Eminent Domain: An Advance Requiem, 58 Yale L. J. 599, 599–600, and nn. 3–4 (1949); *Barron ex rel. Tiernan* v. *Mayor of Baltimore,* 7 Pet. 243, 250–251 (1833) (holding the Takings Clause inapplicable to the States of its own force). Nevertheless, several early state constitutions at the time of the founding likewise limited the power of eminent domain to "public uses." See Sales 367–369, and n. 137 (emphasis deleted). Their practices therefore shed light on the original meaning of the same words contained in the Public Use Clause.

States employed the eminent domain power to provide quintessentially public goods, such as public roads, toll roads, ferries, canals, railroads, and public parks. Lewis §§166, 168–171, 175, at 227–228, 234–241, 243. Though use of the eminent domain power was sparse at the time of the founding, many States did have so-called Mill Acts, which authorized the owners of grist mills operated by water power to flood upstream lands with the payment of compensation to the upstream landowner. See, *e.g., id.*, §178, at 245–246; *Head* v. *Amoskeag Mfg. Co.,* 113 U. S. 9, 16–19, and n. (1885). Those early grist mills "were regulated by law and compelled to serve the public for a stipulated toll and in regular order," and therefore were actually used by the public. Lewis §178, at 246, and n. 3; see also *Head*, *supra*, at 18–19. They were common carriers— quasi-public entities. These were "public uses" in the fullest sense of the word, because the public could legally use and benefit from them equally. See Public Use Limitations 903 (common-carrier status traditionally afforded to "private beneficiaries of a state franchise or another form of state monopoly, or to companies that operated in conditions of natural monopoly").

To be sure, some early state legislatures tested the limits of their state-law eminent domain power. Some States enacted statutes allowing the taking of property for the purpose of building private roads. See Lewis §167, at

230. These statutes were mixed; some required the private landowner to keep the road open to the public, and others did not. See *id.*, §167, at 230–234. Later in the 19th century, moreover, the Mill Acts were employed to grant rights to private manufacturing plants, in addition to grist mills that had common-carrier duties. See, *e.g.,* M. Horwitz, The Transformation of American Law 1780–1860, pp. 51–52 (1977).

These early uses of the eminent domain power are often cited as evidence for the broad "public purpose" interpretation of the Public Use Clause, see, *e.g., ante*, at 8, n. 8 (majority opinion); Brief for Respondents 30; Brief for American Planning Assn. et al. as *Amici Curiae* at 6–7, but in fact the constitutionality of these exercises of eminent domain power under state public use restrictions was a hotly contested question in state courts throughout the 19th and into the 20th century. Some courts construed those clauses to authorize takings for public purposes, but others adhered to the natural meaning of "public use."[2] As

—————

[2] Compare *ante*, at 8, and n. 8 (majority opinion) (noting that some state courts upheld the validity of applying the Mill Acts to private purposes and arguing that the "'use by the public' test" "eroded over time"), with, *e.g.*, *Ryerson* v. *Brown*, 35 Mich. 333, 338–339 (1877) (holding it "essential" to the constitutionality of a Mill Act "that the statute should require the use to be public in fact; in other words, that it should contain provisions entitling the public to accommodations"); *Gaylord* v. *Sanitary Dist. of Chicago*, 204 Ill. 576, 581–584, 68 N. E. 522, 524 (1903) (same); *Tyler* v. *Beacher*, 44 Vt. 648, 652–656 (1871) (same); *Sadler* v. *Langham*, 34 Ala. 311, 332–334 (1859) (striking down taking for purely private road and grist mill); *Varner* v. *Martin*, 21 W. Va. 534, 546–548, 556–557, 566–567 (1883) (grist mill and private road had to be open to public for them to constitute public use); *Harding* v. *Goodlett*, 3 Yerg. 41, 53 (1832); *Jacobs* v. *Clearview Water Supply Co.*, 220 Pa. 388, 393–395, 69 A. 870, 872 (1908) (endorsing actual public use standard); *Minnesota Canal & Power Co.* v. *Koochiching Co.*, 97 Minn. 429, 449–451, 107 N. W. 405, 413 (1906) (same); *Chesapeake Stone Co.* v. *Moreland,* 126 Ky. 656, 663–667, 104 S. W. 762, 765 (Ct. App. 1907) (same); Note, Public Use in Eminent Domain, 21 N. Y. U. L. Q. Rev. 285, 286, and n. 11 (1946) (calling the

noted above, the earliest Mill Acts were applied to entities with duties to remain open to the public, and their later extension is not deeply probative of whether that subsequent practice is consistent with the original meaning of the Public Use Clause. See *McIntyre* v. *Ohio Elections Comm'n,* 514 U. S. 334, 370 (1995) (THOMAS, J., concurring in judgment). At the time of the founding, "[b]usiness corporations were only beginning to upset the old corporate model, in which the raison d'être of chartered associations was their service to the public," Horwitz, *supra*, at 49–50, so it was natural to those who framed the first Public Use Clauses to think of mills as inherently public entities. The disagreement among state courts, and state legislatures' attempts to circumvent public use limits on their eminent domain power, cannot obscure that the Public Use Clause is most naturally read to authorize takings for public use only if the government or the public actually uses the taken property.

## III

Our current Public Use Clause jurisprudence, as the Court notes, has rejected this natural reading of the Clause. *Ante*, at 8–10. The Court adopted its modern reading blindly, with little discussion of the Clause's history and original meaning, in two distinct lines of cases: first, in cases adopting the "public purpose" interpretation of the Clause, and second, in cases deferring to legislatures' judgments regarding what constitutes a valid public purpose. Those questionable cases converged in the boundlessly broad and deferential conception of "public use" adopted by this Court in *Berman* v. *Parker,* 348 U. S. 26 (1954), and *Hawaii Housing Authority* v. *Midkiff,* 467 U. S. 229 (1984), cases that take center stage in the Court's opinion. See *ante*, 10–12. The weakness of those

―――――――

actual public use standard the "majority view" and citing other cases).

two lines of cases, and consequently *Berman* and *Midkiff*, fatally undermines the doctrinal foundations of the Court's decision. Today's questionable application of these cases is further proof that the "public purpose" standard is not susceptible of principled application. This Court's reliance by rote on this standard is ill advised and should be reconsidered.

A

As the Court notes, the "public purpose" interpretation of the Public Use Clause stems from *Fallbrook Irrigation Dist.* v. *Bradley,* 164 U. S. 112, 161–162 (1896). *Ante*, at 11. The issue in *Bradley* was whether a condemnation for purposes of constructing an irrigation ditch was for a public use. 164 U. S., at 161. This was a public use, Justice Peckham declared for the Court, because "[t]o irrigate and thus to bring into possible cultivation these large masses of otherwise worthless lands would seem to be a public purpose and a matter of public interest, not confined to landowners, or even to any one section of the State." *Ibid.* That broad statement was dictum, for the law under review also provided that "[a]ll landowners in the district have the right to a proportionate share of the water." *Id.*, at 162. Thus, the "public" did have the right to use the irrigation ditch because all similarly situated members of the public—those who owned lands irrigated by the ditch–had a right to use it. The Court cited no authority for its dictum, and did not discuss either the Public Use Clause's original meaning or the numerous authorities that had adopted the "actual use" test (though it at least acknowledged the conflict of authority in state courts, see *id.*, at 158; *supra*, at 9, and n. 2). Instead, the Court reasoned that "[t]he use must be regarded as a public use, or else it would seem to follow that no general scheme of irrigation can be formed or carried into effect." *Bradley*, *supra*, at 160–161. This is no statement of con-

stitutional principle: Whatever the utility of irrigation districts or the merits of the Court's view that another rule would be "impractical given the diverse and always evolving needs of society," *ante*, at 8, the Constitution does not embody those policy preferences any more than it "enact[s] Mr. Herbert Spencer's Social Statics." *Lochner* v. *New York,* 198 U. S. 45, 75 (1905) (Holmes, J., dissenting); but see *id.*, at 58–62 (Peckham, J., for the Court).

This Court's cases followed *Bradley*'s test with little analysis. In *Clark* v. *Nash,* 198 U. S. 361 (1905) (Peckham, J., for the Court), this Court relied on little more than a citation to *Bradley* in upholding another condemnation for the purpose of laying an irrigation ditch. 198 U. S., at 369–370. As in *Bradley*, use of the "public purpose" test was unnecessary to the result the Court reached. The government condemned the irrigation ditch for the purpose of ensuring access to water in which "[o]ther land owners adjoining the defendant in error . . . might share," 198 U. S., at 370, and therefore *Clark* also involved a condemnation for the purpose of ensuring access to a resource to which similarly situated members of the public had a legal right of access. Likewise, in *Strickley* v. *Highland Boy Gold Mining Co.,* 200 U. S. 527 (1906), the Court upheld a condemnation establishing an aerial right-of-way for a bucket line operated by a mining company, relying on little more than *Clark*, see *Strickley, supra,* at 531. This case, too, could have been disposed of on the narrower ground that "the plaintiff [was] a carrier for itself and others," 200 U. S., at 531–532, and therefore that the bucket line was legally open to the public. Instead, the Court unnecessarily rested its decision on the "inadequacy of use by the general public as a universal test." *Id.*, at 531. This Court's cases quickly incorporated the public purpose standard set forth in *Clark* and *Strickley* by barren citation. See, *e.g., Rindge Co.* v. *County of Los Angeles,* 262 U. S. 700, 707 (1923); *Block* v. *Hirsh,* 256

U. S. 135, 155 (1921); *Mt. Vernon-Woodberry Cotton Duck Co.* v. *Alabama Interstate Power Co.,* 240 U. S. 30, 32 (1916); *O'Neill* v. *Leamer,* 239 U. S. 244, 253 (1915).

B

A second line of this Court's cases also deviated from the Public Use Clause's original meaning by allowing legislatures to define the scope of valid "public uses." *United States* v. *Gettysburg Electric R. Co.,* 160 U. S. 668 (1896), involved the question whether Congress' decision to condemn certain private land for the purpose of building battlefield memorials at Gettysburg, Pennsylvania, was for a public use. *Id.*, at 679–680. Since the Federal Government was to use the lands in question, *id.*, at 682, there is no doubt that it was a public use under any reasonable standard. Nonetheless, the Court, speaking through Justice Peckham, declared that "when the legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use be palpably without reasonable foundation." *Id.*, at 680. As it had with the "public purpose" dictum in *Bradley*, *supra*, the Court quickly incorporated this dictum into its Public Use Clause cases with little discussion. See, *e.g., United States ex rel. TVA* v. *Welch,* 327 U. S. 546, 552 (1946); *Old Dominion Land Co.* v. *United States,* 269 U. S. 55, 66 (1925).

There is no justification, however, for affording almost insurmountable deference to legislative conclusions that a use serves a "public use." To begin with, a court owes no deference to a legislature's judgment concerning the quintessentially legal question of whether the government owns, or the public has a legal right to use, the taken property. Even under the "public purpose" interpretation, moreover, it is most implausible that the Framers intended to defer to legislatures as to what satisfies the Public Use Clause, uniquely among all the express provi-

sions of the Bill of Rights. We would not defer to a legislature's determination of the various circumstances that establish, for example, when a search of a home would be reasonable, see, *e.g., Payton* v. *New York,* 445 U. S. 573, 589–590 (1980), or when a convicted double-murderer may be shackled during a sentencing proceeding without on-the-record findings, see *Deck* v. *Missouri,* 544 U. S. ___ (2005), or when state law creates a property interest protected by the Due Process Clause, see, *e.g., Castle Rock* v. *Gonzales, post,* at __; *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564, 576 (1972); *Goldberg* v. *Kelly,* 397 U. S. 254, 262–263 (1970).

Still worse, it is backwards to adopt a searching standard of constitutional review for nontraditional property interests, such as welfare benefits, see, *e.g., Goldberg*, *supra*, while deferring to the legislature's determination as to what constitutes a public use when it exercises the power of eminent domain, and thereby invades individuals' traditional rights in real property. The Court has elsewhere recognized "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic," *Payton*, *supra*, at 601, when the issue is only whether the government may search a home. Yet today the Court tells us that we are not to "second-guess the City's considered judgments," *ante*, at 18, when the issue is, instead, whether the government may take the infinitely more intrusive step of tearing down petitioners' homes. Something has gone seriously awry with this Court's interpretation of the Constitution. Though citizens are safe from the government in their homes, the homes themselves are not. Once one accepts, as the Court at least nominally does, *ante*, at 6, that the Public Use Clause is a limit on the eminent domain power of the Federal Government and the States, there is no justification for the almost complete deference it grants to legislatures as to what satisfies it.

C

These two misguided lines of precedent converged in *Berman* v. *Parker,* 348 U. S. 26 (1954), and *Hawaii Housing Authority* v. *Midkiff,* 467 U. S. 229 (1984). Relying on those lines of cases, the Court in *Berman* and *Midkiff* upheld condemnations for the purposes of slum clearance and land redistribution, respectively. "Subject to specific constitutional limitations," *Berman* proclaimed, "when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation." 348 U. S., at 32. That reasoning was question begging, since the question to be decided was whether the "specific constitutional limitation" of the Public Use Clause prevented the taking of the appellant's (concededly "nonblighted") department store. *Id.*, at 31, 34. *Berman* also appeared to reason that any exercise by Congress of an enumerated power (in this case, its plenary power over the District of Columbia) was *per se* a "public use" under the Fifth Amendment. *Id.*, at 33. But the very point of the Public Use Clause is to limit that power. See *supra*, at 3–4.

More fundamentally, *Berman* and *Midkiff* erred by equating the eminent domain power with the police power of States. See *Midkiff,* 467 U. S., at 240 ("The 'public use' requirement is . . . coterminous with the scope of a sovereign's police powers"); *Berman,* 348 U. S., at 32. Traditional uses of that regulatory power, such as the power to abate a nuisance, required no compensation whatsoever, see *Mugler* v. *Kansas,* 123 U. S. 623, 668–669 (1887), in sharp contrast to the takings power, which has always required compensation, see *supra*, at 3, and n. 1. The question whether the State can take property using the power of eminent domain is therefore distinct from the question whether it can regulate property pursuant to the police power. See, *e.g., Lucas* v. *South Carolina Coastal*

*Council,* 505 U. S. 1003, 1014 (1992); *Mugler*, *supra*, at 668–669. In *Berman*, for example, if the slums at issue were truly "blighted," then state nuisance law, see, *e.g., supra*, at 5–6; *Lucas, supra*, at 1029, not the power of eminent domain, would provide the appropriate remedy. To construe the Public Use Clause to overlap with the States' police power conflates these two categories.[3]

The "public purpose" test applied by *Berman* and *Midkiff* also cannot be applied in principled manner. "When we depart from the natural import of the term 'public use,' and substitute for the simple idea of a public possession and occupation, that of public utility, public interest, common benefit, general advantage or convenience . . . we are afloat without any certain principle to guide us." *Bloodgood* v. *Mohawk & Hudson R. Co.*, 18 Wend. 9, 60–61 (NY 1837) (opinion of Tracy, Sen.). Once one permits takings for public purposes in addition to public uses, no coherent principle limits what could constitute a valid public use–at least, none beyond JUSTICE O'CONNOR's (entirely proper) appeal to the text of the Constitution itself. See *ante*, at 1–2, 8–13 (dissenting opinion). I share the Court's skepticism about a public use standard that requires courts to second-guess the policy wisdom of public works projects. *Ante*, at 16–19. The "public purpose" standard this Court has adopted, however, demands the

---

[3] Some States also promoted the alienability of property by abolishing the feudal "quit rent" system, *i.e.*, long-term leases under which the proprietor reserved to himself the right to perpetual payment of rents from his tenant. See Vance, The Quest for Tenure in the United States, 33 Yale L. J. 248, 256–257, 260–263 (1923). In *Hawaii Housing Authority* v. *Midkiff,* 467 U. S. 229 (1984), the Court cited those state policies favoring the alienability of land as evidence that the government's eminent domain power was similarly expansive, see *id.*, at 241–242, and n. 5. But they were uses of the States' regulatory power, not the takings power, and therefore were irrelevant to the issue in *Midkiff*. This mismatch underscores the error of conflating a State's regulatory power with its taking power.

use of such judgment, for the Court concedes that the Public Use Clause would forbid a purely private taking. *Ante*, at 7–8. It is difficult to imagine how a court could find that a taking was purely private except by determining that the taking did not, in fact, rationally advance the public interest. Cf. *ante*, at 9–10 (O'CONNOR, J., dissenting) (noting the complicated inquiry the Court's test requires). The Court is therefore wrong to criticize the "actual use" test as "difficult to administer." *Ante*, at 8. It is far easier to analyze whether the government owns or the public has a legal right to use the taken property than to ask whether the taking has a "purely private purpose"– unless the Court means to eliminate public use scrutiny of takings entirely. *Ante*, at 7–8, 16–17. Obliterating a provision of the Constitution, of course, guarantees that it will not be misapplied.

For all these reasons, I would revisit our Public Use Clause cases and consider returning to the original meaning of the Public Use Clause: that the government may take property only if it actually uses or gives the public a legal right to use the property.

IV

The consequences of today's decision are not difficult to predict, and promise to be harmful. So-called "urban renewal" programs provide some compensation for the properties they take, but no compensation is possible for the subjective value of these lands to the individuals displaced and the indignity inflicted by uprooting them from their homes. Allowing the government to take property solely for public purposes is bad enough, but extending the concept of public purpose to encompass any economically beneficial goal guarantees that these losses will fall disproportionately on poor communities. Those communities are not only systematically less likely to put their lands to the highest and best social use, but are also

the least politically powerful. If ever there were justification for intrusive judicial review of constitutional provisions that protect "discrete and insular minorities," *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152, n. 4 (1938), surely that principle would apply with great force to the powerless groups and individuals the Public Use Clause protects. The deferential standard this Court has adopted for the Public Use Clause is therefore deeply perverse. It encourages "those citizens with disproportionate influence and power in the political process, including large corporations and development firms" to victimize the weak. *Ante*, at 11 (O'CONNOR, J., dissenting).

Those incentives have made the legacy of this Court's "public purpose" test an unhappy one. In the 1950's, no doubt emboldened in part by the expansive understanding of "public use" this Court adopted in *Berman*, cities "rushed to draw plans" for downtown development. B. Frieden & L. Sagalayn, Downtown, Inc. How America Rebuilds Cities 17 (1989). "Of all the families displaced by urban renewal from 1949 through 1963, 63 percent of those whose race was known were nonwhite, and of these families, 56 percent of nonwhites and 38 percent of whites had incomes low enough to qualify for public housing, which, however, was seldom available to them." *Id.*, at 28. Public works projects in the 1950's and 1960's destroyed predominantly minority communities in St. Paul, Minnesota, and Baltimore, Maryland. *Id.*, at 28–29. In 1981, urban planners in Detroit, Michigan, uprooted the largely "lower-income and elderly" Poletown neighborhood for the benefit of the General Motors Corporation. J. Wylie, Poletown: Community Betrayed 58 (1989). Urban renewal projects have long been associated with the displacement of blacks; "[i]n cities across the country, urban renewal came to be known as 'Negro removal.'" Pritchett, The "Public Menace" of Blight: Urban Renewal and the Private

Uses of Eminent Domain, 21 Yale L. & Pol'y Rev. 1, 47 (2003). Over 97 percent of the individuals forcibly removed from their homes by the "slum-clearance" project upheld by this Court in *Berman* were black. 348 U. S., at 30. Regrettably, the predictable consequence of the Court's decision will be to exacerbate these effects.

\*　　\*　　\*

The Court relies almost exclusively on this Court's prior cases to derive today's far-reaching, and dangerous, result. See *ante*, at 8–12. But the principles this Court should employ to dispose of this case are found in the Public Use Clause itself, not in Justice Peckham's high opinion of reclamation laws, see *supra*, at 11. When faced with a clash of constitutional principle and a line of unreasoned cases wholly divorced from the text, history, and structure of our founding document, we should not hesitate to resolve the tension in favor of the Constitution's original meaning. For the reasons I have given, and for the reasons given in JUSTICE O'CONNOR's dissent, the conflict of principle raised by this boundless use of the eminent domain power should be resolved in petitioners' favor. I would reverse the judgment of the Connecticut Supreme Court.